UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| ST. JUDE MEDICAL S.C., INC., <br><br> Plaintiff, <br><br> v. <br><br> LOUISE MARIE JANSSEN-COUNOTTE <br><br> Defendant. | Case No.:  14-cv-877 |

PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION

|  |  |
|---|---|
|  | M. Scott Incerto <br> Texas Bar No. 10388950 <br> James Hughes <br> Texas Bar No. 24074453 <br> Fulbright & Jaworski L.L.P. <br> 98 San Jacinto Boulevard, Suite 1100 <br> Austin, Texas 78701-4255 <br> Telephone:  (512) 474-5201 |
| *Of Counsel* <br> CLIFFORD CHANCE US LLP <br> Stephen M. Nickelsburg <br> Roni Bergoffen <br> 2001 K Street NW <br> Washington, DC 20006-1001 <br> *Applications for admission* <br> *pro hac vice pending* | Layne E. Kruse <br> Texas Bar No. 11742550 <br> Darryl W. Anderson <br> Texas Bar No. 24008694 <br> Fulbright & Jaworski L.L.P. <br> 1301 McKinney, Suite 5100 <br> Houston, Texas 77010-3095 <br> Telephone:  (713) 651-5151 |

Pursuant to Fed. R. Civ. P. 65, plaintiff St. Jude Medical S.C., Inc. ("St. Jude") requests a TRO and a preliminary injunction against defendant Louise Marie ("Marlou") Janssen-Counotte, a former high-level executive for St. Jude International Division ("St. Jude ID").

## INTRODUCTION

St. Jude seeks to bar defendant Janssen-Counotte from using St. Jude's trade secrets on behalf of a direct competitor, Biotronik, Inc. ("Biotronik U.S."), which has hired her as its U.S. President—a fact she disclosed on September 8, 2014.  St. Jude's concerns are especially acute because forensic analysis shows that just prior to her departure—including her last day—Ms. Janssen-Counotte inserted media with confidential company information into her computer and accessed and copied sensitive files from the computer, including strategic planning documents.

In addition, weeks before her departure Ms. Janssen-Counotte participated in the development of a 5-year global strategic plan ("Strat Plan") for competing against companies such as Biotronik globally including in the United States.  On June 2-4, 2014 she participated in a comprehensive, 3-day meeting of high-level executives in Dallas, Texas, focused on the Strat Plan, during which she was observed taking detailed notes (the "Strat Plan Meeting").  On June 27 she abruptly announced that she was resigning from the company, and one of the files she accessed on the day of her departure was a portion of the Strat Plan.

St. Jude believes Ms. Janssen-Counotte was in negotiations to join Biotronik U.S. at the time of the Dallas Strat Plan Meeting.  However, only now has she finally admitted that she has become Biotronik's U.S. President, the highest-ranking executive in charge of competing with St. Jude.  St. Jude has demanded that she return all confidential information but she has not done so.

Ms. Janssen-Counotte's accessing and downloading confidential documents, and her preparations for and attendance and note-taking at the Strat Plan Meeting, were wholly improper.

And her detailed knowledge of St. Jude's highly confidential information and her need to perform effectively as Biotronik U.S.'s President will inevitably lead her and Biotronik U.S. to unlawfully compete with St. Jude. St. Jude respectfully seeks a temporary restraining order and injunction to stop Ms. Janssen-Counotte from assuming duties that would allow her or Biotronik U.S. to use St. Jude's highly confidential information.

## STATEMENT OF FACTS

Plaintiff St. Jude, headquartered in Austin, Texas, is a subsidiary of global medical device manufacturer St. Jude Medical, Inc. ("St. Jude Inc."). St. Jude is responsible for marketing St. Jude Inc.'s products, including cardiac rhythm management ("CRM") products, in the United States. Decl. Joel Becker ¶¶ 5-6 (Ex. A).

Defendant Janssen-Counotte is a citizen of The Netherlands and an alien. Before her resignation, she had a senior management role as Vice President responsible for all product business, including CRM business, for St. Jude ID in her territory. Decl. Denis Gestin ¶ 3 (Ex. B). She interacted with St. Jude in Texas and understood St. Jude's U.S. business and strategy. Gestin Decl. ¶ 5. This was not an issue as long as Ms. Janssen-Counotte worked faithfully for St. Jude. But in the middle of 2014 Ms. Janssen-Counotte switched teams to a competitor, and she used her position to improperly access St. Jude's trade secrets before she departed.

Common sense dictates that Ms. Janssen-Counotte was in talks with Biotronik long before June 27. Yet, as recently as June 4 she participated in the Strat Plan Meeting and working group, learning the company's competitive strategy, including product development, product launches, pricing, marketing, growth forecasts, data development plans, customer targeting strategies, market share information, plans and goals, and talent development strategy for the

United States and globally. The Strat Plan is among St. Jude's most critical, confidential information. Decl. Lisa Andrade ¶ 8 (Ex. C); Becker Decl. ¶¶ 9-13; Gestin Decl. ¶¶ 15-16.

At no time before the Strat Plan Meeting did Ms. Janssen-Counotte reveal that she had engaged or was engaging in discussions with Biotronik or that she planned to resign and begin employment with Biotronik. Nor did she excuse herself to avoid exposure to St. Jude's competitively sensitive information. Andrade Decl. ¶ 13; Becker Decl. ¶ 14; Gestin Decl. ¶¶ 13-14. Rather, she held herself out as a loyal executive, and took detailed notes throughout the meeting. Decl. Philip Ebeling ¶ 6 (Ex. D). St. Jude would not have allowed her to attend the Strat Plan Meeting or participate in the working group had it known she was discussing employment with Biotronik. Andrade Decl. ¶ 14; Becker Decl. ¶ 15; Gestin Decl. ¶ 17.

On June 27, 2014, Ms. Janssen-Counotte resigned in a telephone call with the President of St. Jude ID. However, she refused several times to disclose the identity of her new employer, claiming the information was "confidential." Gestin Decl. ¶ 6; Decl. of Linda Seber ¶ 4 (Ex. E). There was no reason for Ms. Janssen-Counotte not to disclose where she was going unless she thought something was improper–for example, because she was participating in confidential meetings and accessing confidential information while courting St. Jude's competitor.

Further showing her consciousness of wrongdoing, at the time of her resignation Ms. Janssen-Counotte misled her employer about the timing of her negotiations with Biotronik by telling St. Jude ID that she had only been in discussions for two or three weeks. Gestin Decl. ¶ 8; Seber Decl. ¶ 4. It is implausible that Biotronik would alter its international senior management structure by hiring a new President of the U.S. from a competitor in Europe and moving its existing President of the U.S. to its own European operation, or that the accompanying

negotiations, documentation, and transition plans for such a change would be completed, in a mere two to three weeks' time. Such negotiations typically take months. Becker Decl. ¶ 17.

Ms. Janssen-Counotte continued to conceal her new employer for two months after her departure, despite continued requests. Seber Decl. ¶ 11. Only on September 8, 2014 did she finally admit, by letters from her lawyers, that she joined Biotronik. Seber Decl. ¶ 13. As of the date of this filing, Biotronik still has not announced her hiring or the transfer of Biotronik's former President to run its European operations. Gestin Decl. ¶ 12; Becker Decl. ¶ 16.

Concerned by Ms. Janssen-Counotte's conduct, St. Jude analyzed her computer. The results obtained on September 11, 2014 show that throughout June 2014 and up to her departure on July 1, 2014, Ms. Janssen-Counotte plugged at least 5 removable media devices containing confidential documents into her laptop and accessed other sensitive documents from her computer. Decl. Steve Hill ¶¶ 4-6 (Ex. F). For example, Ms. Janssen-Counotte accessed and/or copied (1) a portion of the Strat Plan, (2) St. Jude's worldwide product launch plans for the next 5 years, (3) a distributor management program, (4) a growth plan, and (5) customer correspondence. Hill Decl. ¶ 5-6. Ms. Janssen-Counotte did not turn over any removable media devices prior to her departure. Seber Decl. ¶ 10.

## ARGUMENT

Ms. Janssen-Counotte has shown that she is willing to steal St. Jude's trade secrets, and she has substantial confidential knowledge as a result of her position. She cannot take a position as Biotronik's top U.S. executive without inevitably and unfairly competing with St. Jude and misappropriating St. Jude's confidential information.

Temporary and preliminary injunctive relief are appropriate if St. Jude shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) outweighing any damage caused to the defendant; and (4) no harm to the public interest. *Janvey*

4

*v. Alguire,* 647 F.3d 585, 595 (5th Cir. 2011).  The analysis involves a "sliding scale … which takes into account the intensity of each [factor] in a given calculus." *Texas v Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).  "[T]he purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Meis v. Sanitas Serv. Corp.,* 511 F.2d 655, 656 (5th Cir. 1975).

## I.   ST. JUDE IS LIKELY TO SUCCEED ON THE MERITS

St. Jude is likely to succeed on the merits because: (1) Ms. Janssen-Counotte misappropriated its trade secrets through improper means, and (2) she will probably or inevitably disclose them to Biotronik.  Under Texas law, misappropriation includes the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." TEX. CIV. PRAC. & REM. CODE § 134A.002(3).  "Threatened misappropriation may be enjoined," i*d.* § 134A.003, and "enjoining an employee from using an employer's confidential information is appropriate when it is probable that the former employee will use the confidential information for his benefit (or his new employer's benefit) or to the detriment of his former employer."  *Conley v. DSC Commc'ns Corp.*, No. 05-98-01041-cv, 1999 WL 89955 at *4 (Tex. App.—Dallas Feb. 24, 1999, no pet.); *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ).

### A.   The Information at Issue Is St. Jude's Trade Secrets

The information Ms. Janssen-Counotte has taken and is aware of (1) has independent economic value, and (2) is protected by reasonable efforts to maintain its secrecy, and is thus a "trade secret." TEX. CIV. PRAC. & REM. CODE § 134A.002.[1]

---

[1] "Trade secrets" means information, including a formula, pattern, compilation, program, device, method, technique, process, financial data, or list of actual or potential customers or suppliers, that: (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain

5

### 1. Independent economic value

The trade secrets at issue belong and provide independent economic value to St. Jude as a result of not being generally known to, and not being readily ascertainable by, Biotronik, St. Jude's other competitors, or the public. The trade secrets provide confidential insight into St. Jude and its affiliates' global product launch plans for the next five years, market strategy, and growth forecasts. This information–St. Jude's "playbook"– is not generally known and provides St. Jude with a competitive advantage and significant independent economic value.

### 2. Reasonable efforts to maintain secrecy

As a sales organization in the highly technical and competitive medical device industry, St. Jude survives on the integrity of its trade secrets. St. Jude takes significant efforts to maintain the secrecy of its confidential information. For example, St. Jude strictly limits distribution of sensitive materials and attendance at high-level meetings, including the Strat Plan Meeting. Further, St. Jude takes numerous security measures, including securing access to its facilities, and password protecting computers. In addition, St. Jude's COO opened and closed the Strat Plan Meeting by reminding all attendees that they were the senior group who drives strategy for the company, and that everything that was to be presented and discussed was of the highest confidential nature. The Strat Plan was labeled "confidential."

These security measures reflect the substantial harm that could result if a competitor obtained this information. *See Rugen*, 864 S.W.2d at 552 ("When an effort is made to keep material important to a particular business from competitors, trade secret protection will be available."); *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1151-52, 1156 (D. Kan. 2007) (granting preliminary injunction under identical provision of Kansas UTSA, because

---

economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Tex. Civ. Prac. & Rem. Code § 134A.002.

company policy "utilizes confidential employment agreements, access cards to the buildings, password protected computers, and restricts access to the research and development building").

### B. Ms. Janssen-Counotte has Misappropriated and Threatens to Misappropriate St. Jude's Trade Secrets

Ms. Janssen-Counotte has taken St. Jude's trade secrets through improper means and threatens to further disclose them.  First, Ms. Janssen-Counotte obtained St. Jude's confidential information by participating in the global Strat Plan working group and attending the Strat Plan Meeting in Dallas without disclosing her conflict of interest.  *See In re Cardin*, No. 11-52077, 2013 WL 1092118, at *10 (E.D. Tenn. Jan. 31, 2013) (finding improper obtaining confidential information after failure to disclose conflict of interest).

Second, Ms. Janssen-Counotte held on removable media, accessed and/or copied numerous trade secret files.  This was extraordinarily improper, constitutes misappropriation, and conclusively demonstrates her wrongful intent.  *See Genesco Sports Enter., Inc. v. White*, No. 3:11–CV–1345–N (BF), 2011 WL 6593415, at *8 (N.D. Tex. Oct. 27, 2011); *see also Bimbo Bakeries USA, Inc. v. Botticella*, 2010 WL 571774, at *10, 13 (E.D. Pa. Feb. 9, 2010).[2]

Third, Ms. Janssen-Counotte cannot erase St. Jude's trade secrets from her consciousness and will necessarily rely on them to perform her new duties effectively.  An injunction is "appropriate when it is probable that the former employee will use the confidential information for his benefit (or his new employer's benefit) or to the detriment of his former employer." *Conley*, 1999 WL 89955 at *4.  This is so even absent wrongdoing because of the inevitable disclosure of trade secrets.  *See FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 505 (5th Cir.

---

[2] Ms. Janssen-Counotte also violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), by accessing these files beyond her authorization.  *Beta Tech. v. Meyers*, 2013 WL 5602930 (S.D. Tex. Oct. 10, 2013) (CFAA claim based on allegation that defendant downloaded confidential information at time of resignation to compete against plaintiff).

7

1982) ("Even assuming the best of good faith, [the former employee] will have difficulty preventing his knowledge of [plaintiff's trade secrets] from infiltrating his work.").

Courts in other jurisdictions agree. For instance, in *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995), Pepsi obtained an injunction against a high ranking employee after he took a job with a direct competitor, which makes Gatorade. The court observed that unless the executive "possessed an uncanny ability to compartmentalize information," he would necessarily be making decisions by relying on his knowledge of Pepsi's trade secrets. *Id*. at 1269. "In other words, Pepsi finds itself in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." *Id*. at 1270.

That is exactly what happened here. The Strat Plan and worldwide launch plans are the playbook, and Ms. Janssen-Counotte "has left, playbook in hand, to join the opposing team before the big game." *Id*. Indeed, Ms. Janssen-Counotte is a higher level executive than the former employees in those cases. As President of Biotronik she is not merely a player, she is the coach, who will now be drafting Biotronik's playbook for competing with St. Jude.

## II.    ST JUDE WILL SUFFER IRREPARABLE HARM

"An irreparable injury is one that cannot be undone by monetary damages or one for which monetary damages would be 'especially difficult to calculate.'" *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 335 (5th Cir. 2013) (unpub.). In Texas, threatened disclosure of trade secrets constitutes irreparable injury as a matter of law, *id.* at 336, and the new Texas trade secret law specifically provides that "[a]ctual or threatened misappropriation may be enjoined." TEX. CIV. PRAC. & REM. CODE § 134A.003(a) (emphasis added).

St. Jude faces irreparable harm because Ms. Janssen-Counotte has its trade secrets and is in a position to use them to benefit Biotronik. The potential harm also is irreparable because it will be difficult to calculate damage from the competitive use of St. Jude's trade secrets. Texas

8

courts have repeatedly held that damage from theft of competitive information is difficult to calculate and constitutes irreparable harm. *Id.*; *see also Propath Servs., L.L.P. v. Ameripath, Inc.*, No. Civ.A.3:04–CV–1912–P, 2004 WL 2389214, at *7 (N.D. Tex. Oct. 21, 2004); *Graham v. Mary Kay, Inc.,* 25 S.W.3d 749, 753 (Tex. App.-Houston [14th Dist.] 2000, pet. denied).

The value of the trade secrets at issue cannot be overstated. A competitor with access could, among other things, plan its research and development efforts, its product launches, its customer and market identification and penetration, its sales, its pricing and reimbursement strategies, and its personnel and distribution channels, all with a view to anticipate and counter St. Jude's position in the market across all of its products lines and geographies. The resulting harm to St. Jude's business is difficult to calculate and to "undo" with monetary damages, because damages cannot be estimated to restore St. Jude's hard-earned advantage in the marketplace. *Graham,* 25 S.W.3d at 753 ("loss of goodwill, clientele, marketing techniques, office stability and the like are not easily assigned a dollar value").

Even were the potential harm to St. Jude calculable, Ms. Janssen-Counotte, as an individual, is unlikely to have the financial capacity to pay the amount of damages at issue, thus the harm would still be irreparable. *See, e.g.*, *Retractable Techs, Inc. v. Occupational & Med. Innovations, LTD.*, No. 6:08 CV 120, 2010 WL 3199624, at *5 (E.D. Tex. Aug. 11, 2010).

### III.   THE BALANCE OF HARMS FAVORS AN INJUNCTION

The balance of the harms weighs heavily in favor of an injunction. St. Jude has made significant investments to market its products and taken substantial measures to maintain the secrecy of its information. If an injunction is not entered, St. Jude will lose its trade secret information to its competitor, resulting in loss of competitive advantage for at least five years.

Any harm to Ms. Janssen-Counotte of an injunction does not change this analysis. Ms. Janssen-Counotte cannot suggest that preventing her from using trade secrets she improperly

9

obtained will cause her harm. And any harm caused by her inability to work for Biotronik without putting such stolen trade secrets to use is simply a consequence of her own wrongdoing that cannot trump St. Jude's valid interest in protecting its trade secrets.

## IV.     PUBLIC POLICY FAVORS INJUNCTIVE RELIEF

A temporary restraining order and preliminary injunction would benefit and not harm the public interest, as Texas public policy favors the protection of trade secrets. *K&G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.*, 314 S.W.2d 782, 790 (Tex. 1958). The very "function of trade secret law is that of 'condemning the employment of improper means to procure the trade secret.'" *FMC Corp.*, 677 F.2d at 505. It would be contrary to public policy to allow Biotronik to benefit from the theft of St. Jude's trade secrets at St. Jude's expense.

### REQUEST FOR RELIEF

St. Jude respectfully requests that the Court enjoin Defendant as follows:

a.  Enter a temporary restraining order and a preliminary injunction prohibiting Ms. Janssen-Counotte, and any person in concert with her, from holding the position of President of Biotronik or undertaking any job duties for Biotronik in the areas of strategic planning, pricing, marketing, or product development of CRM devices and products until at least September 1, 2015;

b.  Enter a temporary restraining order and a preliminary injunction restraining Ms. Janssen-Counotte, and any person in concert or participation with her, from using or disclosing St. Jude's trade secrets and proprietary information to Biotronik or any other competitor of St. Jude;

c.  Order expedited discovery pursuant to the motion filed contemporaneously with this Application so that this matter may be prosecuted and tried on a timeline in the interests of all of the parties;

d.  Order the immediate production and the sequestration of the USB devices inserted into Ms. Janssen-Counotte's computer in June and July 2014 for forensic investigation; and the sequestration and preservation of any communications between Defendant or her counsel and Biotronik about a position at Biotronik; and

e.  Set a preliminary injunction hearing at the earliest practicable time.

Dated: September 16, 2014

                                      Respectfully submitted,

                             By:  <u>/s/ M. Scott Incerto</u>

**Certificate of Notice**

Defendant Louise Marie Janssen-Counotte's whereabouts in the United States are unknown. Pursuant to Federal Rule of Civil Procedure 65(b), I hereby certify that on September 16, 2014, I have taken reasonable steps to provide Defendant Janssen-Counotte notice of the foregoing Application for a Temporary Restraining Order and Preliminary Injunction by emailing an electronic copy of the Application and Complaint to:

- Louise Marie Janssen-Counotte, at marlou.janssen@hotmail.com. This is her personal email address where she has received other communications. Ms. Janssen-Counotte is a Dutch citizen but has provided notice that she is working for Biotronik Inc. in the United States.

- In addition, the general counsel for her new employer will be sent the same material: E. Sean Donohue, at sean.donahue@biotronik.com.

- Finally, in-house counsel for her new employer will be sent the same material: James Maldonado, Corporate Counsel of Biotrionik, Inc. at james.maldonado@biotronik.com.

/s/ Layne E. Kruse