# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| ST. JUDE MEDICAL S.C., INC., <br><br> Plaintiff, <br><br> v. <br><br> LOUISE MARIE JANSSEN-COUNOTTE <br><br> Defendant. | Case No.: 14-cv-877 <br><br> **DECLARATION OF JOEL BECKER** |

Joel Becker declares pursuant to 28 U.S.C. § 1746:

1. I am employed as President of the Americas Division of St. Jude Medical, Inc., and Vice President of St. Jude Medical S.C., Inc. ("St. Jude"), the plaintiff in this case. I have worked for St. Jude since 2002, serving in a variety of capacities. I was appointed to my current position in 2011.

2. I am a resident of Austin, Texas and work at St. Jude's headquarters in Austin, Texas located at 6300 Bee Cave Parkway, Austin, Texas 78746.

3. I make this declaration in support of St. Jude's application for a temporary restraining order, as well as preliminary and permanent injunctive relief, to prevent Louise Marie ("Marlou") Janssen-Counotte from taking a position with Biotronik, Inc. ("Biotronik U.S."), one of St. Jude's direct competitors.

**Background Information**

4. St. Jude is a Minnesota corporation whose principal place of business is in Austin, Texas. St. Jude is a wholly-owned subsidiary of St. Jude Medical, Inc. ("St. Jude Inc."), also a Minnesota corporation, with its worldwide headquarters located in St. Paul, Minnesota.

5. St. Jude is engaged in the business of marketing and selling a wide range of sophisticated medical devices and related products used to diagnose and treat cardiovascular disease and other disorders, including cardiac rhythm management ("CRM") products.

6. St. Jude's Austin headquarters houses St. Jude Inc.'s sales operation, which employs over 2,800 people nationwide, more than 500 of whom are in Texas, as well as certain corporate functions of St. Jude Inc.

7. Biotronik U.S. is one of St. Jude's direct competitors. St. Jude and Biotronik U.S. compete vigorously against each other in the CRM medical device market. CRM includes pacemakers, implantable cardioverter defibrillators and cardiac resynchronization therapy to treat heart failure. Both St. Jude and Biotronik U.S. sell their CRM devices directly to customers, such as physicians and hospitals, and through authorized sales representatives.

8. Ms. Janssen-Counotte is a former senior executive of two of St. Jude's European affiliates, who has recently taken a position as President of Biotronik U.S.

**Ms. Janssen-Counotte's Theft of Trade Secrets Immediately Prior to Joining Biotronik U.S.**

9. Each year St. Jude, together with its affiliates, prepares a 5-year, global strategic plan (the "Strat Plan"), which provides details of their global competitive strategy, including product development; product launches; pricing; market strategy; growth forecasts; data development plans; customer targeting strategies; market share information, plans and goals; and talent development strategy for the United States and globally. The Strat Plan is among St. Jude's most critical, confidential, and trade secret information. Obtaining the Strat Plan would allow a competitor a huge, unfair advantage in competing with St. Jude.

10. From June 2 to June 4, 2014, Ms. Janssen-Counotte and I attended meetings in Dallas, Texas in which the Strat Plan was rolled out to the highest ranking executives of St. Jude

and its global affiliates (the "Strat Plan Meeting"). The purpose of the meeting was to discuss and strategize regarding the implementation of this plan on a highly confidential basis.

11. At the opening session of the meeting, Mike Rousseau, the Chief Operating Officer of St. Jude Medical, Inc., informed the attendees that the participants of the meeting were the senior group who drives strategy for the company. In addition, he emphasized that everything that was to be presented and discussed was of the highest confidential nature and directed that there should be no disclosure or discussion of anything presented or discussed outside of the meeting. Mr. Rousseau again emphasized the confidentiality of the Strat Plan and the Strat Plan Meeting discussion at the conclusion of the meeting.

12. In the weeks leading up to the meeting, Ms. Janssen-Counotte participated in a global working group whose purpose was to prepare the Strat Plan. As a member of this working group Ms. Janssen-Counotte obtained highly confidential strategic information regarding the company's global operations.

13. As a result of participating in the meeting and the working group Ms. Janssen-Counotte gained access to confidential trade secrets well beyond those that pertained to her job in Europe, including St. Jude trade secrets. Ms. Janssen-Counotte's participation in the Strat Plan Meeting provided her with intimate knowledge of St. Jude's trade secrets, business opportunities, strategies, customer relationships and preferences, and business development initiatives. In particular, Ms. Janssen-Counotte gained access to St. Jude's crucial, current, confidential, and proprietary information and trade secrets, including:

- Product pipeline and new product rollout plans, along with the financial and technical data underlying these plans;
- Product pricing;

- Target customers and sectors;

- Market strategy across all product lines;

- Sales techniques and strategies; and

- Growth model.

14. At no time before or during the Strat Plan Meeting did Ms. Janssen-Counotte reveal to me, or to my knowledge, to anyone at St. Jude, that she had engaged or was engaging in discussions with any Biotronik entity, or that she planned on resigning and beginning employment with Biotronik U.S. Nor did she excuse herself from the meeting to avoid exposure to any of St. Jude's competitively sensitive information.

15. St. Jude would not have allowed Ms. Janssen-Counotte to attend the Strat Plan Meeting or participate in a working group's preparation for the meeting had it known she was discussing, or intended to discuss, potential employment with Biotronik.

16. To my knowledge, Biotronik still has not publicly announced the hiring of Ms. Janssen-Counotte as the President of its U.S. operations or, for that matter, the transfer of Biotronik U.S.'s former President to run Biotronik U.S.'s operations in Europe. The failure to publicly announce such senior executive moves is highly unusual in the industry.

17. I understand that Ms. Janssen-Counotte has stated that the Biotronik opportunity came up in a mere 2-3 weeks' time. In my experience, the discussion, negotiation, and decision process for hiring and moving senior executives within a major company, including a major international medical device company, typically take months. For this reason I believe that at the time of Ms. Janssen-Counotte's attendance at the Strat Plan Meeting, she was already in negotiations to become President of Biotronik U.S.

**St. Jude's Protection of Its Confidential and Proprietary Information**

18. St. Jude has taken significant efforts to maintain the secrecy of its confidential information, by adopting policies and implementing procedures designed to safeguard that information.

19. For example, St. Jude requires its executives to enter into confidentiality agreements before gaining access to its trade secrets. St. Jude also restricts access to confidential information to those within the company who need that information, including through secure access to its facilities, security safeguards on its computer systems, restriction of access to confidential files, and restriction of access to high-level planning meetings such as the Strat Plan meeting.

**Value of Trade Secrets Accessed by Ms. Janssen-Counotte and Resulting Harm to St. Jude**

20. The value of the information unlawfully accessed and misappropriated by Ms. Janssen-Counotte to St. Jude's competitive position in the market, and vis-à-vis Biotronik U.S. in particular, cannot be overstated. A competitor with access to such information could, among other things, plan its research and development efforts, its product launches, its customer and market identification and penetration, its sales, pricing and reimbursement strategies, and its personnel and distribution channels, all with a view to anticipate and counter St. Jude's current and future position in the market across all of its product lines and geographies, and obtaining an unfair advantage over St. Jude.

21. The monetary value of the resulting harm to St. Jude's business – which includes the loss of sales and market share and the blunting of its edge in the introduction of new and innovative products – would be difficult to calculate and difficult to "undo" with monetary

damages, because monetary damages cannot be estimated to restore St. Jude's hard-earned competitive advantage in the marketplace.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 16th day of September, 2014.

Austin, Texas

/s/ Joel Becker<br>
Joel Becker